AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of South Carolina

| | |
|---|---|
| United States of America<br>v.<br>LUIS ANGEL CORDOVA-LIZARRGA,<br>a/k/a "Cordova"<br><br>*Defendant(s)* | )<br>)<br>)   Case No. 2:15-mj-87<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __January 4 - 6, 2015__ in the county of __Charleston__ in the _____ District of __South Carolina__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1956 (a)(2)(B) | International Money Laundering |
| 18 U.S.C. 1956(h) | Conspiracy to Commit International Money Laundering |
| 31 U.S.C. 5332 | Bulk Cash Smuggling |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Brendan McSheehy, SA
Printed name and title

Sworn to before me and signed in my presence.

Date: 8/13/2015

City and state: Charleston, SC

_____
Judge's signature

Mary Gordon Baker, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT OF SPECIAL AGENT BRENDAN MCSHEEHY:**

This affidavit is submitted in support of a criminal complaint charging FERNANDO ROGEL-BLAS ("ROGEL") and LUIS ANGEL CORDOVA-LIZARRGA ("CORDOVA") with International Money Laundering, in violation of 18 U.S.C. § 1956(a)(2)(B); Conspiracy to Commit International Money Laundering, in violation of 18 U.S.C. § 1956(h); and Bulk Cash Smuggling, in violation of 31 U.S.C. § 5332.

Your affiant, Brendan McSheehy, Special Agent (SA) of the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, does depose and state:

## INTRODUCTION

1. Your affiant is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code (U.S.C.); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code.

2. Your affiant has been a member of the Drug Enforcement Administration since January 1999 and is currently assigned to the Charleston Resident Office in Charleston, South Carolina. Previous to that, your affiant McSheehy was employed as a police officer for eleven years with the Wilmington City Police Department, Wilmington, North Carolina. Since your affiant's employment with the DEA, your affiant has worked exclusively on drug investigations. As both an SA with the DEA and as a police officer, your affiant has participated in the investigation of not less than three hundred cases. These cases involved state and federal narcotics violations. Your affiant has worked in an undercover capacity, conducted surveillance, arrested suspects, executed search warrants, seized evidence, prepared investigative reports, handled informants and has debriefed

1

informants and questioned suspects. Your affiant has assisted prosecuting attorneys in the preparation of cases for trial and has testified in United States District Court. Your affiant has consulted with other agents and prosecuting attorneys in matters dealing with the enforcement of the Controlled Substance Act and as a result has gained considerable experience.

## BASIS FOR FACTS IN THIS AFFIDAVIT

3. Since May of 2014, DEA San Diego has been investigating a Mexican-based drug-trafficking organization (DTO) with ties to the Cartel De Jalisco Nueva Generation. Through their investigation, DEA San Diego has specifically identified several members of the DTO, to include: Pedro LIMON Sagrero ("LIMON"), Jose Antonio PEREZ-Quintero, a/k/a "TONO" ("PEREZ"), and Victor LOPEZ-Moreno ("LOPEZ"). To date, the investigation has revealed that PEREZ is importing approximately 50 kilograms of illegal drugs per week from Mexico into the Southern California area, to include transporting and storing narcotics within and outside the Riverside County, CA area. PEREZ then distributes illegal drugs throughout Southern California and sends large drug shipments, via tractor-trailers with hidden compartments, to other locations throughout the United States, including, but not limited to, Kentucky, Illinois, South Carolina, North Carolina, and New York. PEREZ also arranges for the transportation of drug proceeds, in the form of bulk currency, from the Midwestern and Eastern United States to Southern California and Mexico.

4. On October 31, 2014, agents from DEA San Diego Office contacted agents in the DEA Columbia, South Carolina Office. Agents from the DEA San Diego Office, who were on a state authorized wire and electronic intercepts, stated that an

unidentified Hispanic male, later identified as LOPEZ, had left the San Diego area and was in South Carolina. According to agents in San Diego, LOPEZ, under the direction of LIMON, had picked up approximately 11 kilograms of cocaine and 2 kilograms of heroin from PEREZ for delivery to LIMON at an unknown location in South Carolina. As a result of that information, DEA agents attempted to locate LOPEZ but were unsuccessful. Later this same date, agents from the DEA San Diego Office advised that LOPEZ had arrived at an unknown destination in South Carolina and that LIMON was now in possession of the cocaine and heroin referenced above. DEA agents in Charleston later confirmed through investigation that LIMON had received approximately 11 kilograms of cocaine and 1 kilogram of heroin on October 31, 2014 in Summerville, SC.

5. On December 30, 2014, United States District Court Judge Sol Blatt, Jr., District of South Carolina, issued an order which authorized the interception of the wire and electronic communications over cellular telephone (843) 437-3136 (**TARGET TELEPHONE # 2**) being used by LIMON. Interception on **TARGET TELEPHONE # 2** began on December 31, 2015. On January 2, 2015, at approximately 8:36 p.m., LIMON, using **TARGET TELEPHONE # 2,** received an incoming call, session # 307, from 909-485-9995, a phone known through investigation to be used by PEREZ.[1] Having become familiar with the Target Subjects' voices by this point in the investigation, Spanish speaking monitors were able to identify the participants in the call as LIMON and PEREZ. During the call, PEREZ said to LIMON, "I want to ask you for a big favor." LIMON responded, "Okay, tell me." PEREZ stated, "See if in the morning

---

[1] Throughout this affidavit, your affiant will refer to calls and text messages placed both to and from the Target Subjects. Your affiant's conclusions regarding the identities of the participants in the calls and text messages are based on both the Spanish speaking monitors' familiarity with the Target Subjects' voices and the phone numbers they commonly use as well as my training and experience, knowledge of the case thus far, and previous intercepts.

3

*B. McS*

you could meet a friend early around there. See if you could see him around there." LIMON asked, "Where am I going to see him?" PEREZ responded, "Around there, really close to you." PEREZ later stated, "I told him where your place is." LIMON acknowledged by stating, "Mm-hum." PEREZ then advised LIMON, "I think that it is where you are at, and see if you could give him a receipt." LIMON asked, "How much?" PEREZ responded, "One hundred seventy-nine, more or less." LIMON confirmed, "One hundred seventy-nine." PEREZ acknowledged, "Mm-hum." LIMON then stated, "Well, that is fine, you just tell me where." PEREZ then stated, "But he would need a telephone number. A number that is not this one, you need a prepaid one just to use to with them." LIMON responded, "Well, I have to go get one." Based on my training and experience, knowledge of the case thus far and previous intercepts, I believe that when PEREZ advised LIMON to meet a "friend" to give him a "receipt," PEREZ is referring to LIMON providing the "friend" U.S currency as payment for a shipment of drugs. Furthermore, on January 3, 2015, at approximately 10:15 a.m., agents observed LIMON enter Rincon Latino Mini Mart, a cell phone store located at 1316 Remount Road. At approximately 10:28 a.m., LIMON received an incoming call from Maribel MONJARAS ("MONJARAS"). During the call LIMON advised MONJARAS that he "was there now seeing about the phone," confirming agents' surveillance in reference to the above quoted conversation between PEREZ and LIMON.

6. On January 2, 2015, at approximately 10:18 p.m., LIMON, using **TARGET TELEPHONE # 2,** received an incoming text message, session #325, from PEREZ on the number listed above. The text message was received and translated as follows: "Hey, I will send you the number for the friend who is picking up the money."

4

B. M<sup>c</sup>J

Based on my training and experience, knowledge of the case thus far and previous intercepts, your affiant believes that PEREZ is advising LIMON that he will be sending LIMON the contact information for the money courier that LIMON is being directed to meet. I further believe that this text message references a previous conversation mentioned in the previous paragraph.

7. On January 2, at approximately 11:03 p.m., PEREZ, using 909-485-9995, session # 339, sent a text message to **TARGET TELEPHONE # 2**. The text message was received and translated as follows: "Contact Fernando at 928-750-6305, on Miky's behalf." Based on my training and experience, knowledge of the case thus far and previous intercepts, I believe that PEREZ is following through on his previous instructions to provide LIMON with the contact information for the courier LIMON has been directed to meet.

8. On January 2, 2015, at approximately 11:04 p.m., PEREZ sent another text from 909-485-995, session # 340, to **TARGET TELEPHONE # 2**. The text message was received and translated as follows: "Give him 179, please." Based on my training and experience, knowledge of the case thus far and previous intercepts, I believe that PEREZ is instructing LIMON to provide the courier $179,000.00 for payment for a shipment of drugs previously received.

9. On January 3, 2015, at approximately 12:16 a.m., TARGET TELEPHONE #2 received an incoming text message, session # 351, from 909-485-9995, used by PEREZ. The text message was received and translated as follows: "Better hand the buddy 229, thanks." Based on my training and experience, knowledge of the case thus far and previous intercepts, I believe that PEREZ is now instructing LIMON to give

5

the courier, Fernando, $229,000.00 instead of the previously mentioned $179,000.00 mentioned in the previous paragraph.

10. On January 5, 2015, at approximately 10:15 a.m., Task Force Officer (TFO) Jamie Humphries observed LIMON walk out of the residence located at 1925 Bacons Bridge Road, Lot # 39, carrying a red bag and walk to a black Ford Expedition bearing SC license plate KIW-352, which was parked in the driveway.[2] TFO Humphries then observed LIMON open the rear driver side door, place the red bag on the rear seat, get in the drivers' side front door, and drive out of the area.

11. On January 5, 2015, at approximately 11:10 a.m., LIMON, using **TARGET TELEPHONE # 2,** received an incoming call, session # 660, from 843-743-1267, a phone known through investigation to be used by Victor Antonio LOPEZ-Moreno ("LOPEZ"). During the call, LOPEZ said to LIMON, "The only Holiday Inn that was close to Lowe's, it is like I told you. You go back to 526 and you ….." LIMON replied, "The fuckers sent the address." LOPEZ asked, "Is it 1934 Savannah Highway?" LIMON responded, "No, the addresses that they sent me….hold on, do not hang up. The address they sent me, it says, lock, like a lock, then W-O-O-D and after street." LOPEZ later asked LIMON, "Do you need help with something?" LIMON replied, "Well, yes, that way we can take it to them already. I'm bringing a big ticket to the fuckers bu…I'm bringing them the ticket. I was going to come with Perrazo but I called his number and his wife has it." LOPEZ responded, "Hmm." LIMON stated, "I answered and she said, 'I'm here at an appointment. Rodolfo is already at the shop.' So

---

[2] During a traffic stop of the black Expedition conducted by the Town of Summerville Police Department on November 29, 2014, LIMON identified himself by the name Pedro LIMON Sacredo and presented the officer with an identity card bearing the same name with the following identifying information: DOB: 09-24-1976, address: 1925 Bacon Bridge Road, Lot 39, Summerville, SC 29485.

6

I'm going to see if the guy is here." LOPEZ asked, "What is Rodolfo going to do? But what is it that you need?" LIMON replied, "No, well my navigator doesn't work and I have to take them the papers for some trucks." LOPEZ responded, "Alright." LIMON stated, "I have to take the papers for some trucks and they were waiting for me there. But I thought it was near here." LOPEZ replied, "No, it is downtown." LIMON added, "So I thought I would put the address in the navigator and that way I could go. But since it does not work…I had already taken it out, and now I wanted to put it in but it does not have satellite." LOPEZ asked, "Where are you now?" LIMON answered, "I am here on Rivers at Rodolfo's shop. Rivers and Remount. Based on my training and experience, knowledge of the case thus far and previous intercepts, I believe that LIMON is informing LOPEZ that he has a "big ticket" meaning a lot of money, to deliver to the couriers who are at the Holiday Inn on Lockwood. LIMON can't get his GPS ("navigator") to work and is trying to get directions or someone to go with him to the hotel.

12. On January 5, 2015, at approximately 12:00 p.m., SA Gary Lawrence observed the above mentioned black Ford Expedition arrive in the parking lot of the Holiday Inn Express located at 250 Spring Street, Charleston, SC. SA Lawrence observed LIMON and Rodolfo PULIDO ("PULIDO") get out of the Expedition and walk to the entrance of the hotel. LIMON appeared to be carrying what appeared to be a box as he entered the hotel. (Video surveillance later revealed that it was a red and green bag that LIMON was carrying under his arm.)

13. On January 5, 2015, at approximately 12:10 p.m., LIMON, using **TARGET TELEPHONE # 2**, placed an outgoing text message, session # 674, to

7

PEREZ at 909-485-9995. The text message was received and translated as follows: "Sir, I already delivered that." Based on my training and experience, knowledge of the case thus far and previous intercepts, I believe that LIMON is informing PEREZ that he has dropped off the money ($229,000.00) to the courier, Fernando.

14.   Shortly thereafter, at approximately 12:20 p.m., SA Lawrence observed LIMON and PULIDO exit the hotel and walk to the Ford Expedition. SA Lawrence advised that LIMON was no longer carrying anything. LIMON and PULIDO entered the Expedition and drove out of the area.

15.   Several hours later on January 5, 2015, at approximately 4:55 p.m., agents observed two Hispanic males, later identified as ROGEL and CORDOVA, walk out of the hotel, pulling suitcases behind them, and enter a red Chrysler minivan, bearing California license plate 7FFY873. The minivan departed the hotel parking lot and drove to a dumpster at Crosby's Seafood, 382 Spring Street, Charleston, SC. DEA Resident Agent in Charge (RAC) Tim Davis observed CORDOVA dispose of an object in the dumpster. The minivan then departed the area followed by surveillance units. RAC Davis immediately traveled to the dumpster and recovered the items discarded by CORDOVA, which included a red and green Christmas bag containing ten opened food saver bags, used black electrical tape, and rubber bands. Based on my training and experience, knowledge of the case thus far and previous intercepts, I believe that the items located within the bag are consistent with those typically used to package large amounts of currency.

16.   Agents followed the couriers in the minivan as they drove through the downtown area. The couriers drove up and down streets doing U-turns and stopping

8

*B.M*

often employing what appeared to be counter surveillance techniques. The couriers, employing another counter surveillance technique, suddenly pulled into the Cumberland Street parking garage and parked. I observed one of the couriers get out of the vehicle and walk out to the street. The courier looked up and down the street several times while talking on his cell phone. I also observed the driver sitting in the parking garage talking on his cell phone while the engine was running. Shortly afterwards, I observed the courier walk back and reenter the vehicle and the two drove out of town, at which point we continued surveillance until the South Carolina Highway Patrol (SCHP), at the request of DEA Charleston, conducted a walled off traffic stop. The couriers, ROGEL and CORDOVA, consented to a search of the minivan which resulted in the seizure of $113,975.00 in U.S. currency.

17. On January 5, 2015, at approximately 5:30 p.m., **TARGET TELEPHONE # 2** received an incoming call, session # 708, from PEREZ on 909-485-9995. During the call LIMON stated, "So, he called me and said 'No listen, the numbers aligned for us, we counted everything, it is a surplus of 100 pesos.' But well I am here now." PEREZ asked, "Who are you talking to me about?" LIMON answered, "About this guy, the one I brought the 2-2-9 to, listen. The 229 little pesos." PEREZ replied, "Oh, mine. Oh, there was a surplus of 100 pesos." LIMON stated, "Yes, because at first he called me and when I left him that, because since I was there and told him "Hey, here it is.' I told him; 'If you want' I told him, 'let us see the stickers around there.' Right?" PEREZ responded, "Yes." LIMON stated, "So, when I was coming here, he sent me a message, 'Listen' he told me; 'In one...in the one 24 one, one that had 24, 21,310 was in there.' I told him, 'No that could not be', I told him, 'because we looked well', I told him.

9

'That was why I told you if I stayed there' I told him, 'to count them for you.' And I told him, 'Count it well, count it well and let me know.' I told him, because 'It should not be wrong.' I told him, 'If it is wrong', I told him, 'here had to be…the rest had to be here, because all of yours is apart." PEREZ replied, "Yes." Based on my training and experience, knowledge of the case thus far and previous intercepts, I believe that LIMON is informing PEREZ that after he had given the couriers the full $229,000.00 plus and extra $100.00 (100 pesos), the couriers contacted him and stated that the money did not add up to $229,000.00. Furthermore, it is your affiant's belief that LIMON did not provide the agreed upon amount and is trying to convince PEREZ that he had by arguing that he gave the couriers the opportunity to count the money.

18.   During the traffic stop by the SCHP Trooper, ROGEL and CORDOVA were asked where they were going. CORDOVA, the driver, stated they were going to Oklahoma; ROGEL, the passenger, stated that they were going to Atlanta. CORDOVA was also asked if there were any large amounts of U.S. currency in the vehicle and he stated no. During the traffic stop, both ROGEL and CORDOVA agreed to be interviewed by DEA agents in reference to the $113,975.00 found in the minivan.

19.   After being read his *Miranda* warnings ROGEL stated the following:

    a. He entered the United States the previous Friday and stated that he crosses the Mexican/United States border approximately 5 times a week.

    b. ROGEL stated that he operates a business, Machine CR, which buys heavy equipment in the United States and exports it to Mexico. ROGEL stated that he frequents "Ritchie Brother's Auctions" to purchase heavy equipment.

    c. ROGEL stated that after crossing into the United States, he and CORDOVA went to Yuma, Arizona where they met with CARRASCO, who rented them the car. After that, he stated that he and CORDOVA traveled to Houston, New Orleans, and then

      came to Charleston, SC. ROGEL stated that he and CORDOVA stayed at the Holiday Inn located on Highway 17 at Lockwood Drive in Charleston, SC on the night of January 4, 2015.

    d. ROGEL stated that after leaving Charleston, SC, he and CORDOVA were traveling to Atlanta, GA, to look at more heavy equipment. After leaving Atlanta, GA, ROGEL stated that he and CORDOVA were scheduled to travel to Oklahoma City, OK, to purchase a piece of heavy equipment, then planned on arriving back in Mexico on Friday, January 9, 2015.

    e. ROGEL stated that the money located in the rental car belonged to both him and CORDOVA and totaled $117,000.00.

20. After being read his *Miranda* warnings, CORDOVA stated the following:

    a. CORDOVA stated that he and ROGEL entered into Arizona from Mexico on Friday, January 2, 2015, at approximately 3:00 pm. CORDOVA stated that he and ROGEL were together when they crossed the border into the U.S. CORDOVA stated that he and ROGEL both work for a heavy equipment company, "Machine CR", in Mexico.

    b. CORDOVA stated that ROGEL had a friend in Yuma, Arizona, named CARRASCO, who rented the car for them. CORDOVA stated that he paid for the rental car as well as the hotel room at the Holiday Inn in Charleston, SC.

    c. CORDOVA stated that he and ROGEL travel all around the United States frequently, sometimes flying, in order to purchase heavy equipment/machinery to have exported back to Mexico.

    d. CORDOVA stated that before arriving in Charleston, SC, he and ROGEL stopped in New Orleans, then stopped to look at another city with a beach, but could not specifically name the city.

    e. CORDOVA stated that he and ROGEL were supposed to purchase 2 backhoes and 2 other large pieces of heavy equipment/machinery during their trip.

    f. CORDOVA stated that the money located in the rental car belonged to both him and ROGEL, the money is from Mexico, and stated that the money totaled $117,000.00.

    g. CORDOVA stated that the money was not declared while entering the United States on this trip. CORDOVA stated that the money has been declared previously, but no machinery was purchased on the previous trips, so the money was left at the residence of CARRASCO in Yuma, Arizona, so that he and ROGEL did not have to take the money back to Mexico.

      h. CORDOVA stated that after leaving Charleston, SC, they planned on driving 2 hours only to then stop and rest. CORDOVA stated that on the following day, January 6, 2015, he and Fernando were scheduled to drive to Oklahoma City, OK, to purchase heavy equipment/machinery.

21. Based on the foregoing facts and circumstances, your affiant asserts that there is probable cause to believe that FERNANDO ROGEL-BLAS and LUIS ANGEL CORDOVA-LIZARRGA did commit International Money Laundering, in violation of 18 USC § 1956(a)(2)(B); conspire together and with others to commit International Money Laundering, in violation of 18 U.S.C.§ 1956(h); and committed Bulk Cash Smuggling, in violation of 31 United States Code § 5332 (a)(1) (b).

Your affiant affirms under penalty of perjury that the foregoing affidavit is true and accurate to the best of his knowledge.

_Brendan McSheehy_
Brendan McSheehy, Special Agent

Subscribed and sworn to before me this 13th day of August ___, 2015 in Charleston, South Carolina at 11:10 a.m./p.m.

_Mary Gordon Baker_
United States Magistrate Judge
District of South Carolina